UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No: 12-11-GFVT |
| | ) | |
| V. | ) | |
| | ) | |
| LEE C. TEVIS, | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| Defendant. | ) | **ORDER** |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

To most builders, constructing and financing a home for a loan officer at a bank, would seem like a good idea. Loan officers, however, must follow the rules like everyone else. Here, the builder, Lee Tevis, was hired to construct a home for the banker, James Tate. When they created Two Amigos, LLC and conspired to commit bank fraud criminal charges ensued. Tate pled guilty to certain charges and after a six day trial, Tevis was convicted of all but one of the charges. He now seeks a judgment of acquittal, or, alternatively, a new trial. [R. 46 & 50.] For the reasons set out below the jury verdict will be allowed to stand.

**I**

After a jury has reached a verdict, a defendant is permitted to file a motion for judgment of acquittal challenging the sufficiency of the evidence pursuant to Federal Rule of Criminal Procedure 29. Fed.R.Crim.P. 29(a), (c). "A defendant making such a challenge bears a very heavy burden." *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000); see also *United States v. Kimbrel*, 532 F.3d 461, 465 (6th Cir. 2008) (citing

States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986) ("A defendant mounting a sufficiency challenge bears a "heavy burden."")) When undertaking such review, the court "must decide whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007); see also *United States v. Kimbrel*, 532 F.3d 461, 465 (6th Cir. 2008). Moreover, courts are precluded from weighing the evidence, considering witness credibility, or substituting its judgment for that of the jury. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). "A judgment is reversed on insufficiency-of-the-evidence grounds 'only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole.' " *Gardner*, 488 F.3d at 710 (quoting *United States v. Barnett,* 398 F.3d 516, 522 (6th Cir. 2005); *United States v. Beddow,* 957 F.2d 1330, 1334 (6th Cir. 1992)).

Rule 33 establishes that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." *U.S. v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010); *see also* Fed.R.Crim.P. 33(a). The phrase "interest[ ] of justice" is not defined within the rule, and courts have had marginal success in trying to "generalize its meaning." *Id.* (quoting *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989)). Still, several themes remain constant in the Rule 33 context. The conventional use of a Rule 33 motion "is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.' " *Id.* (quoting *United States v. Crumb,* 187 Fed.Appx 532, 536 (6th Cir. 2006)); *see also United States v. Legette-Bey,* 147 Fed.App'x 474, 486 (6th Cir. 2005); *United States v. Graham,* 125 Fed.App'x 624, 628 (6th Cir. 2005); *United States v. Solorio,* 337 F.3d 580, 589 n. 6 (6th

2

Cir. 2003). Finally, "[w]ith a Rule 33(a) motion for new trial on the ground that the verdict is against the weight of the evidence, the power of a court is much broader because a court may weigh the evidence and consider the credibility of the witnesses." *U.S. v. Dimora*, 879 F.Supp.2d 718, 724 (N.D. Ohio 2012).

## II

### A

Tevis assigns error to the Court's decision not to permit evidence of a civil settlement agreement between Founders and those allegedly involved in the bank fraud, including Tevis. [R. 46-1 at 4.] Tevis urges that this evidence would have established Founders "(1) had settled all claims in the Franklin Circuit Civil action, (2) had forgiven each of the allegedly "fraudulent" loans to Two Amigos, (3) had paid Mr. Tevis' substantial attorneys' fees as part of the settlement, and (4) had settled with all parties **except** James Tate…" [Id. (emphasis in original).] The Court ruled that the settlement agreement was inadmissible to the extent it would be introduced for purposes of establishing liability. [R. 45 at 223 (Tr Day 1).] Tevis also believes the Court erred when it denied admission of a copy of the insurance policy that covered Founders for lost funds associated with bad loans. [R. 46-1 at 7.] The United States argues that the settlement agreement was not relevant under FRE 401, more prejudicial than probative under FRE 403 and, finally, inadmissible under FRE 408. [R. 50 at 1-7.]

Evidentiary rulings of the Court are reviewed for an abuse of discretion. *Argentine v. United Steelworkers of America, AFL-CIO*, 287 F.3d 476, 486 (6th Cir. 2002). The Sixth Circuit "will reverse only when [ ] find[ing] that such abuse of

3

discretion has caused more than harmless error." *United Steelworkers of America*, 287 F.3d at 486 (citing *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325 (6th Cir.1994)).

At trial, after hearing the arguments from parties, the Court ruled that the settlement agreement was inadmissible under Federal Rule of Evidence 408 which prohibits the admission of evidence of compromise offers and negotiations to "prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). The rule provides that the evidence might be admitted for another purpose, "such as proving a witness's bias or prejudice." Fed. R. Evid. 408(b). The defense, however, sought to introduce the Settlement agreement for purposes of showing that the bank did not impute liability to Tevis. [R. 60 at 23 (Tr. Day 1).] A strong argument exists that the evidence is irrelevant per Rule 401. The Government argued at trial, and now, that the crime was committed when the false statements were made to the bank. An after-the-fact settlement agreement has no bearing on whether the underlying false statements were made.

As explained at trial, admission of this agreement is in clear contravention of the Federal Rule of Evidence 408, which prohibits the introduction of a settlement agreement to "disprove the validity or amount of a disputed claim." FRE 408(b). The draft settlement agreement[1] which Tevis sought to admit states it is not "an admission of liability on the part of any party hereto." [R. 46, Exhibit B at 3.] Nevertheless, this is the very reason Tevis sought its admission. There are many reasons for parties to settle disputes in the civil context and to argue the civil settlement exonerated Tevis of liability in the mind of the bank is presumptive. Even if it did, this has no impact on the question of criminal liability. Finally, the Court properly left open the possibility of using the

---

[1] Factually, it is important to note that the Settlement Agreement possessed by Defense Counsel was a draft agreement, not in final form. As the Government argues in their brief, no explanation has been provided as to how Tevis would justify the entry of a non-final settlement agreement.

4

agreement for other purposes. The Court was even willing to allow limited references to the agreement in opening statements, although defense counsel made the calculated decision not to discuss the settlement agreement without being able to fully describe its circumstances and to argue the settlement proved Tevis' innocence. [R. 60 at 226 (Tr. Day 1).]

Tevis misinterprets a flurry of case law in support of his position. First, Tevis refers the Court's attention to *United States v. Gonzalez*, 748 F.2d 74 (2nd Cir. 1984). In that case, the Second Circuit permitted statements made during the course of a civil settlement into a criminal trial. These statements, however, were distinct from the case at hand as they did not address the issue of liability but, rather, "were admitted to establish that Gonzalez committed a crime." *Id*. This does not help Tevis. Under this Court's holding at trial, statements introduced for a purpose other than proving liability through the settlement agreement, as in *Gonzalez*, would be admissible. Second, Tevis cites to the Second Circuit's holding in *Manko v. United States*, 87 F.3d 50, 54 (2nd Cir. 1996), where the Court cites approvingly to their earlier decision in *Gonzalez*. As has already been discussed, *Gonzalez* is distinct. Finally, Tevis argues that the Sixth Circuit has resolved the issue in his favor. To support this proposition, he misreads *McAuliffe v. United States*, 514 Fed. App'x. 542, 549 (6th Cir. 2013). In *McAuliffe,* the Sixth Circuit explained that a 2006 rule amendment abrogated the Circuit's earlier holding in *United States v. Logan,* 250 F.3d 350, 367 (6th Cir. 2001) and applied FRE 408 in criminal proceedings. *Id*. The Sixth Circuit's explanation makes it clear that FRE 408, which prohibits the use of settlement agreements to prove liability, applies in criminal proceedings. As such, the settlement agreement is inadmissible.

Tevis' argument that the government opened the door to the settlement agreement when it introduced Exhibit 109, a cover letter dated July 11, 2007 and signed by multiple parties to the bank's future settlement, also fails. The Government points out that Exhibit 109 was introduced to show Tevis obtained the signature of a five year old child, J.M., not to show evidence of compromise. Used for this purpose, as it clearly was, it cannot be said to open the door to the settlement agreement.

The insurance policy that reimbursed Founders for the fraud was not relevant to the question of whether Tevis defrauded Founders. Tevis suggests that the insurance policy is relevant as it provides evidence that his conviction was necessary for the bank to recover loan losses. [R. 46-1 at 7.] Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence." FRE 401 (a). The facts provided in the insurance agreement have no bearing on the evidence provided to prove the guilt of Tevis.

Finally, Tevis seems to attack the validity of the indictment when he suggests the settlement agreement and insurance policy "offers a motive as to why Mr. Tevis was suddenly indicted more than five (5) years after the civil litigation" commenced. [R. 46-1.] Tevis makes this accusation without support. He has made no suggestions of misconduct and provided no evidence that Founders had any control over whether the case was presented to the grand jury. Either way, this motivation is not relevant as to whether or not Tevis committed the crimes of which he was convicted at trial. The Court finds no error warranting either a new trial or a judgment of acquittal.

**B**

Next, Tevis argues the Court erred in issuing the supplemental jury instruction on Aggravated Identity Theft that the Court gave in response to Juror Note 5. Tevis contends the note was "coercive, improper and prejudicial to the Defendant." [R. 46-1 at 9.]

Tevis concedes in his motion that the supplemental instruction should be reviewed under the deferential abuse of discretion standard. [R. 46-1 (citing *United States v. Fisher,* 648 F.3d 442, 446-447 (6th Cir. 2011)).] Under this standard, reversal is only appropriate if " 'the instructions viewed as a whole, were confusing, misleading or prejudicial.' " *Fisher,* 648 F.3d at 446-447 (quoting *United States v. Young*, 553 F.3d 1035, 1050 (6th Cir. 1990)); see also *United Steelworkers of Am.*, 287 F.3d at 484.

The Court finds that the instruction was neither coercive, improper or prejudicial. The Jury submitted to the Court a note requesting clarification on counts 9, 10 and 11 which stated:

> Can we clarify counts 9, 10 & 11
>
> If we find not guilty on a previous one & guilty on another, does this mean 9, 10 & 11 would be thrown out?
>
> In other words does he have to be guilty of 1-8 to convict on 9, 10 & 11

[R. 40 at 3.] Tevis argues the note only obligated the Court to further instruct the jury on counts 9, 10 and 11. [R. 46-1 at 10.] The Court provided supplemental instructions that addressed each of the counts 1-8 and explained independently whether each of the questioned counts 1-8 would support a finding on counts 9-11. For example, the court instructed:

7

> A guilty verdict for Count 1, 18 U.S.C. § 1349, Conspiracy to Commit Bank fraud, standing alone, will support a conviction for Counts 9, 10 and 11, if each and every one of the elements for Counts 9, 10, and 11 are found beyond a reasonable doubt.
>
> A guilty verdict for Count 2, 18 U.S.C. § 1344, Bank Fraud, standing alone, will support a conviction for Counts 9, 10 and 11, if each and every one of the elements for Counts 9, 10, and 11 are found beyond a reasonable doubt.

[R. 41 at 26.] The Court provided similar instructions, as above, for counts 3-8. Tevis argues the note only obligated the Court to further instruct the jury on counts 9, 10 and 11. [R. 46-1 at 10.] He believes the Court's additional instructions on 1-8 were not necessary and in error. Tevis' suggested supplemental language failed to fully answer the questions posed in the jury's note. More complete answers were necessary to ensure clarity. As Tevis argues in his brief, "[w]hen a jury seeks clarification of particular issues… the judge should clear away its difficulties 'with concrete accuracy.' " *United States v. Brown*, 54 F. App'x 201, 210 (6th Cir. 2002) (quoting *Bollenbach v. United States,* 326 U.S. 607, 612–13 (1946)). Furthermore, "it is not sufficient for the court to rely on more general statements in its prior charge. 'A conviction ought not to rest on an equivocal direction to the jury on a basic issue.' " *Brown*, 54 F. App'x at 210 (quoting *Bollenbach,* 326 U.S. at 612–13). The Court's thorough answer to the posed question cannot be error, especially in light of the significant discretion awarded the trial judge in this situation.

Defense counsel specifically objects to the Court's use of the words "will support," arguing that this language is suggestive that the jury should convict Tevis on counts 9-11. [R. 46-1 at 11.] The language selected by the Court provided an accurate and complete explanation of what was necessary to support a conviction under the questioned counts. Defense counsel's consternation about the use of the words "will

8

support" and his citations to Merriam Webster's Dictionary suggest he has little faith in the ability of a jury to fairly weigh the evidence presented. In a complicated case of bank fraud where we depend on the jury to determine guilt or innocence, we must also be able to defer judgment in matters like this. Defining the words "will support" is within their capacity and a more formal, legal definition was unnecessary. In light of the high degree of deference provided to the trial court in this realm and that reversal is only appropriate in rare circumstances, the Court finds no error warranting either a new trial or a judgment of acquittal.

## C

Tevis also argues the Court erred in not granting a mistrial after receiving notes from the jury indicating their difficulty in reaching a verdict. On Friday, the first day of deliberation, the Jury sent notes stating the they were "not in agreement @ this time" and then "—Change—we cannot come to an agreement @ this time split decision." [R. 40 at 2.] The jury returned to deliberate on Monday where it asked for clarification on outstanding counts, discussed *supra IIB*, and then informed the Court it "cannot come to an agreement on Counts 1 & 2." [R. 40 at 3.] At this point, Tevis' counsel moved for a mistrial. The Court did not grant the mistrial but, rather, issued an *Allen Charge*, over Tevis' objection. Tevis believes the Court erred in not granting his motion for mistrial as the "jury had already deliberated a sufficient length of time, prior to the *Allen* charge, to warrant a mistrial." [R. 46-1 at 13.] He cites no case law in support of this proposition.

Granting a mistrial requires a finding that, "taking all the circumstances into consideration, there is a manifest necessity for doing so." *Renico v. Lett*, 130 S.Ct. 1855, 1863 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). A court's

9

decision to grant a mistrial is due significant deference, but courts are cautioned that this "power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* (quoting *Perez*, 22 U.S. at 580). The Sixth Circuit "review[s] the decision to give an *Allen* charge for abuse of discretion, recognizing that 'the presiding judicial officer is in the best position to decide when to give the charge.' " *United States v. Clinton*, 338 F.3d 483, 487 (6th Cir. 2003) (quoting *United States v. Frost,* 125 F.3d 346, 373 (6th Cir. 1997) (citation and internal quotation omitted)).

The jury had been deliberating for less than two days when the Court decided to give additional instruction. The Court used the Sixth Circuit pattern instruction on deadlocked juries, often referred to as an *Allen Instruction*, named after *Allen v. United States,* 164 U.S. 492, 501-502 (1896). The Court modified this instruction only so as to include a supplemental sentence which the parties had agreed to in advance of reading the directive.[2] Under the circumstances, it cannot be said that the Court erred in providing the Allen Instruction. In addition to the content coming directly from the Pattern Instructions, this timeframe is well within what has been considered reasonable under Sixth Circuit precedent. In *United States v. Reed*, the Sixth Circuit affirmed the decision of a trial court that provided the Allen instruction on the twelfth day of jury deliberations. 167 F.3d 984, 991 (6th Cir. 1999).

As the Allen Instruction was properly given, it would have been inappropriate for the Court to grant a mistrial at this juncture. For the aforementioned reasons, relief under either Rule 29 or Rule 33 is inappropriate.

---

[2] The Court additionally stated, "So with this instruction and the others I've given to you in mind, I'm going to ask that you now return to the jury room and resume your deliberations." [R. 57 at 66 (Tr. Day 6).]

# D

Finally, Tevis argue that the evidence failed to establish guilt beyond a reasonable doubt on charges 2-11 and that the verdict did not conform with the evidence. [R. 46-1 at 14-22.] Tevis advances numerous arguments, all revolving around the same general theme. Tevis did not knowingly engage in any illegal behavior. The loans were not fraudulent, absent a showing of intent to not repay the loans, because they were within the lending authority of the bank officers. The settlement agreement proves the bank concluded it was not defrauded. He summarizes his arguments, "the Defendant cannot have defrauded the Bank because the evidence shows conclusively that there was not any fraud there; the loans were knowingly made and approved by the Chairman and Chief Executive Officer of the Bank." [R. 46-1 at 17.] These arguments were all made at trial and the jury convicted. For the following reasons, it is clear that this verdict was supported by the evidence presented.

As was stated in greater detail, *supra IA*, courts are precluded from weighing the evidence, considering witness credibility, or substituting its judgment for that of the jury. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). "A judgment is reversed on insufficiency-of-the-evidence grounds 'only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole.'" *Gardner*, 488 F.3d at 710 (quoting *United States v. Barnett,* 398 F.3d 516, 522 (6th Cir. 2005); *United States v. Beddow,* 957 F.2d 1330, 1334 (6th Cir. 1992)).

Tevis was convicted of counts 3, 4 and 5 which charged "the Defendant with violations of Title 18, United States Code, Section 1014, which makes it a crime for anyone knowingly to make a false statement to a federally insured bank for the purpose

of influencing the lending activities of a federally insured bank." [R. 41 at 20 (Jury Instructions).] The Government had to prove that Tevis, aided and abetted by Tate, made a false statement to Founders, knew the statement was false when it was made, did so for the purpose of influencing a lending action of the institution, causing Founders to approve the loans listed in Counts 3,4, and 5 of the indictment and that Founders was federally insured. [*Id.*]

Tevis claims he never made any knowingly false statements to influence Tate or Wesley and that the United States failed to present any evidence to this effect at trial. [R. 46-1 at 17-19.] He claims that Tate prepared all the loan documents and that the loans were approved by Tate and Wesley. [R. 46-1 at 17-18.] In support of his argument, Tevis cites *United States v. Wells*, 519 U.S. 482 (1997) for the proposition that "Section 1014 criminalizes "knowingly mak[ing] any false statement or report ... for the purpose of influencing in any way the action" of a Federal Deposit Insurance Corporation (FDIC) insured bank "upon any application, advance, ... commitment, or loan." *Wells*, 519 U.S. at 490 (citing 18 U.S.C. § 1014.) This citation does not assist, however, in resolving the dispute. Rather, the discussion in *Wells* was about whether the "materiality of falsehood is an element" under the statute. The citation provided by Tevis is nothing more than a condensed quotation from 18 U.S.C. § 1014.

The real issue is whether, viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the Tevis, through the aiding and abetting of Tate, made knowingly false statements to influence the action of Founders. At trial, the Government introduced testimony from Tate where he states that Tevis and Martinez established Two Amigos, LLC. [R. 58 at 213 (Tr. Day 2).] Tate recalled it was

Tevis' idea to create a LLC. [R. 54 at 43 (Tr. Day 3).] Tevis admitted to setting up Two Amigos LLC. [R. 56 at 48 (Tr. Day 5).] Tate testified that Two Amigos had no business expenses and that the real purpose of the loan was to build his house. [R. 58 at 215 (Tr. Day 2).] Tevis admitted Two Amigos existed for the purpose of providing "temporary financing for Mr. Tate's house." [R. 56 at 52 (Tr. Day 5).] He plainly admitted to knowing that the Two Amigo's loans were to be used in constructing Tate's home [R. 56 at 54, 56 (Tr. Day 5)] but attempted to justify the action by suggesting the building of Tate's home was a legitimate "business expense" of Two Amigos. [R. 56 at 55 (Tr. Day 5).]

Additionally, Tevis testified that he knew the social security number that Martinez gave to Tate was JM's social security number. [R. 56 at 56 (Tr. Day 5).] Martinez testified that Tevis actually requested his son's social security number. [R. 54 at 106 (Tr. Day 3).] Despite knowing that Tate was seeking an additional loan, Tevis claims he was unaware of the reason that Tate needed the social security number. [R. 56 at 57 (Tr. Day 5).] Remarkably, he then testifies that he was unaware it was wrong to use a 5 year old child's social security number and testified that he would have given his own children's social security number to Tate had he been asked for it. [R. 56 at 58 (Tr. Day 5).]

The aforementioned testimony alone is enough to support the charges against Tevis. He formed Two Amigos, LLC for the purpose of taking loans from Tate that would provide financing for the building of Tate's house. He claimed the loans were for "business expenses" despite knowing that they were for the financing of Tate's home. When he ran out of money he assisted in applying for more loans by providing the social security number of a five year old child. Tevis can claim ignorance, as he has done

13

throughout these proceedings, but a jury's decision to ignore these pleas of ignorance is certainly not unreasonable. Viewing the evidence in a light most favorable to the government it is completely reasonable for a rational trier of fact to conclude Tevis made knowingly false statements to influence the action of Founders.

Tevis was also convicted of counts 6, 7 and 8 which charged him " with violations of Title 18, United States Code, Section 656, which makes it a crime for an employee of a federally insured bank to embezzle [misapply] the money, funds, or credits of the bank." [R. 41 at 21 (Jury Instructions).] To be convicted the Government had to prove he was aided and abetted by James B. Tate, an officer and employee of Founders, that Founders was a bank whose deposits were insured by the Federal Deposit Insurance Company at the time alleged in the indictment, that he willfully misapplied, embezzled, abstracted and purloined moneys, funds, and credits entrusted to the care of the bank, that the Defendant acted with intent to injure or defraud the bank; and that the amount of money taken was more than $1,000. [*Id.*]

Tevis argues that he cannot be convicted on the aiding and abetting theory as the loans were made for a lawful purpose and within the lending authority of Tate and Wesley. The jury instructions explained that to " '**willfully misapply**' a bank's money or property means to intentionally convert such money or property for one's own use and benefit, or for the use and benefit of another, knowing that one had no right to do so." [R. 41 at 22 (Jury Instructions)(emphasis in original).]

Tate had lending authority up to $1,000,000 on secured loans and $100,000 on unsecured loans. [R. 58 at 195 (Tr. Day 2).] This, however, does not mean that all loans given underneath these ceilings are in conformity with the law. Tate misapplied the

bank's money in issuing the loan. The fact that the loan was within his lending authority does not make it legal. As has been explained, *supra*, Tate knew the scheme and knew that he was using the social security number of a five year old child in the supporting documentation. Finally, he knew that the money was being placed in Two Amigos for the express purpose of building him a house. Mr Tate admits the illegality of his actions in his testimony:

> Q. Okay. Now, there's a few unpleasant things we want to talk about before we wrap up for the day. Okay. What you've described here today, what was done, the loans were illegal; were they not?
>
> A. Yes. They were illegal.
>
> Q. Okay. And you've acknowledged your role in this scheme; have you not?
>
> A. Yes.

[R. 58 at 273 (Tr. Day 2).] Tate willfully misapplied the bank's funds. By virtue of Tevis' involvement in Tate's illegalities, he is also guilty.

Tim Wesley was President, CEO and Chairman of the Board at Founders Bank. [R. 54 at 7 (Tr. Day 3).] Wesley had lending authority up to $2,000,000 on secured loans and up to $500,000 on unsecured loans. [R. 58 at 105 (Tr. Day 2).] Tevis argues that Wesley knew "who was responsible for the loans, knew the facts attendant to them, and approved the making thereof for the construction of President Tate's house, regardless of the convoluted manner in which the funds were dispersed to the Defendants." [R. 46-1 at 21.] This interpretation is not congruent with the testimony of Tate who explained that Wesley knew he was building a house [R. 58 at 23 (Tr. Day 2)] and knew that he was lending money from the bank but did not know how the loan was being structured. [R.

58 at 42 (Tr. Day 2) ("Terms and conditions and borrowing entities and amounts were not specifically discussed, just the need for more money to get it finished.").]

Finally, as the Government argues in their brief, even if Wesley had been aware of the facts regarding the structuring of the loan, "this approval would not relieve Defendants of criminal liability, because the victim is the bank as an entity." *United States v. Abboud*, 438 F.3d 554, 593 (6th Cir. 2006) (citing *United States v. Rackley,* 986 F.2d 1357, 1361 (10th Cir. 1993) ("Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. It is the financial institution itself—not its directors or agents—that is the victim of the fraud the statute proscribes.")). While *Abboud* is a check kiting case, the logic applies equally in this situation. Wesley's knowledge of the scheme would not have made his approval of the fraudulent loans okay.

Finally, Tevis was convicted of Counts 9, 10 and 11 of the indictment which charged him with "violations of Title 18, United States Code, Section 1028A, which makes it a crime for a person to use a means of identification of another person during and in relation to a felony violation listed in the statute." [R. 41 at 23 (Jury Instructions).] In this case, Tevis was charged with knowingly using the identity of a minor child, J.M., without his consent in connection with the allegations made in Counts 2 – 8 of the indictment. Under 18 U.S.C. § 2 it was possible to convict Tevis of any of Counts 2 – 8 of the indictment through the aid and abetment of Tate, even though Tevis did not personally commit the crime.

Tevis attacks his conviction on these charges indirectly. He provides no unique arguments against the charges but, rather, argues that since the supporting charges 2-8

were unsupported by the evidence, these charges must fail, too. As the Court has established, charges 2-8 are supported by the evidence. As such, Tevis' attack on charges 9-11 are without merit and justify no relief.

### III

Tevis has provided no grounds to show the jury's judgment is unsupported by substantial and competent evidence. *Gardner*, 488 F.3d at 710. After "viewing the evidence in a light most favorable to the government" it is clear that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Tevis did not satisfy the "very heavy burden" imposed on him in challenging the sufficiency of the evidence as a result his motion for judgment of acquittal is denied. Further, Tevis has provided no reason for this Court to vacate its judgment and grant a new trial.

Accordingly, it is hereby **ORDERED** as follows:

1. Tevis' Motion for a New Trial or Judgment of Acquittal [R. 46] is **DENIED**;

2. Tevis' Sealed Motion for leave to Seal a Document [R. 48] is **GRANTED**.

This 6th day of December, 2013.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge